IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:17cr116-MHT |
| | ) | (WO) |
| JEREMY WALKER | ) | |

## OPINION

Defendant Jeremy Walker pled guilty to one count of deprivation of civil rights in violation of 18 U.S.C. § 242. At his sentencing, the court granted both his and the government's motions for a downward variance, but did not accept either party's proposed sentence. Instead, Walker was sentenced to four weekends imprisonment and six months home-confinement. This opinion explains why.

### 1. BACKGROUND

In 2012, Walker tried to commit suicide. The 21-year-old had lost his job, gotten into an argument with his girlfriend, and, because a conflict with his mother and brother forced him to move out, was without

1

a place to stay or any money to cover his own apartment. Feeling abandoned and like a failure, he broke a bottle of beer and tried to use the broken glass to cut himself, later saying he just wanted to "get the pain out." Hospital Records (doc. no. 22-5) at 3.

This cry for help, while a low point, was not entirely unpredictable. Walker has a history of low self-esteem, depression, and anger-management issues. Growing up, Walker experienced severe financial insecurity, frequent moves with frequent school changes, and harassment and ridicule at school. Both Walker's mother and his brother suffer from depression and post-traumatic stress disorder, and Walker had no relationship with his father, who was absent except for a few phone calls in his pre-teens, which ended when his father lost interest. A psychological assessment by Dr. Catherine Boyer reported that "since adolescence [Walker has had] occasional incidents resulting from a loss of control over his anger." Boyer Report (doc.

no. 22-1) at 5. Indeed, Walker was expelled from the eleventh grade after getting into a fight.

Walker's self-esteem, which Dr. Boyer observed as "likely to be fragile and may drop dramatically in response to criticism by other people" seemed to spiral following his expulsion, as he found it difficult to maintain steady employment. Walker's mother reported that job uncertainty contributed to his poor mental health, as he often became depressed when unemployed. *Id.* at 2. His mother also reported that he has issues with mood, anger, occasional bouts of breaking things, and feeling like he is a failure.

Walker's inability to manage his emotions has led to two arrests: once after losing his temper with family and shoving the police officer who arrived at the scene, and once for getting into an altercation with a waitress after a friend either failed to pay entirely or failed to tip. Neither incident led to a conviction.

Dr. Boyer concluded that Walker was suffering from depression at the time of the evaluation. *Id.* at 5. She also noted that feelings of low self-worth and depression underlie his anger management issues, and that, "Even though anger control issues occur relatively infrequently, [he] may be more vulnerable to loss of temper under high stress situations compared to someone who has never had any anger related incidents." *Id.*\*

---

\* Walker's sentencing occurred on two separate dates: one in October and one in December 2017. At the October hearing, Walker included Dr. Boyer's report as an evidence of his mental illness. At that hearing, Walker was unable to speak when addressed: he quickly became overwhelmed and started crying. While he had voluntarily started seeing a mental-health counselor, he was only able to afford sessions sporadically. The court continued sentencing until December 18, 2017, in order to provide the parties an opportunity to present evidence on other matters pertinent to the case, and, because of its observations of Walker, ordered mental-health counseling at the expense of the court at least twice per month.

Prior to the second sentencing hearing, the government ordered and submitted its own psychological report to the court. This opinion does not rely heavily on that report because its findings were questionable. The psychologist, Dr. Glenn King, misreported a number of, albeit minor, easily

In 2014, just two years after his suicide attempt, Walker applied to be a correctional officer with the Alabama Department of Corrections (ADOC). The application process consisted of filling out an application and passing a written examination and an agility test. While the application included a release of all medical information, it did not inquire as to the applicant's mental health or medical history. Walker submitted his application, passed the evaluations, and reported for work at Elmore Correctional Facility shortly thereafter.

Walker did not receive any training prior to beginning work in May 2014. According to testimony by

---

verifiable biological details. Further, he concluded that Walker was "at least of average intelligence" based solely on the fact that he is enrolled in college. King Report (doc. no. 52-5) at 5. Dr. King concluded his three-page report stating there was "no evidence whatsoever for the presence of any mental defect or psychological issues," and that Walker has "no psychological issues." *Id*. However, this conclusion flies in the face of Dr. Boyer's clearly more credible report, Walker's diagnosis of depression by his counselor during the same two-month period, and the observations of anyone who witnessed Walker in court in October. For those reasons, the court did not rely on this report.

Leon Bolling, the former Warden of Elmore, it was regular practice at the time to place "cadets"--people who have completed the application process but with no training or experience--in a facility for a number of months prior to sending them to academy. According to the Standard Operating Procedure for the Elmore facility, cadets are also supposed to receive "pre-academy training" during this time, which is to be "documented as it takes place so it can be sent to the academy at the completion of their pre-academy training." Elmore Standard Operating Procedure: Training (doc. no. 22-12) at 2.

During this onsite, pre-academy period of their employment, cadets' main role is to shadow senior certified correctional officers to get a feel for the job. While they are not to have direct supervision or control over prisoners, cadets are exposed to prisoners and can conduct pat-down searches. It is not until a cadet attends the academy--an 11-week training course upon completion of which cadets become certified

correctional officers--that he or she learns techniques in de-escalation, how to manage prisoners, and self-defense. The academy is also where correctional officers are taught about the legal limits on use of force, the Eighth Amendment and civil rights.

Walker did not receive any of this training; there is no documentation of any "pre-academy" training and he did not attend academy.

As of July 3, 2014, cadet Walker had been working on site at the Elmore facility for slightly over a month. Most days had consisted of following around a disinterested senior officer, being told to "toughen up" by other corrections officers, and, occasionally, finding himself alone and without supervision.

While some of the details of that day are disputed, what is clear is that Walker assaulted a prisoner. It started in the cafeteria. Walker's brother was also a correctional officer at Elmore, and, despite concerns raised by a senior officer, the two brothers worked the same shift. In the cafeteria, a prisoner, C.C., told

Walker that he was "nothing without his brother." Use of Force Written Statement (doc. no. 51-5). Shortly after, and for reasons unknown to the court, Walker was directed to retrieve C.C., who had made his way to the yard. Walker was not shadowing an officer nor did he have any supervision. When he was unable to coax C.C. inside, a physical altercation ensued. Following the incident in the yard, C.C. was separated from Walker and placed in a holding cell.

A video of what came next shows Walker thrusting past several corrections officers into the holding cell, swinging furiously and landing punches on the back, shoulders and head of handcuffed C.C. Walker then hurls C.C. into the holding-cell wall. Within seconds, a number of correctional officers make their way into cell and separate Walker from C.C., who is then taken to the infirmary to treat bruises he sustained from the assault.

Walker immediately resigned. He matriculated at Alabama State University and began its five-year

biology program. He has worked a number of jobs part-time, including working as a lab assistant at the university. Once he could afford it, he voluntarily started seeing a counselor to learn how better to manage his mental-health issues. When not in school or at work, he was taking care of his mother, who served in the armed forces and suffers from diabetes, depression, and post-traumatic stress disorder.

2. DISCUSSION

Walker's conviction carries a maximum custodial sentence of 10 years. *See* 18 U.S.C. § 242. As described below, the Guidelines range was 18 to 24 months imprisonment. Pursuant to the plea agreement, the government sought a downward variance to six months imprisonment. Probation recommended 18 months custody, based on the Guidelines. Walker moved for a downward variance to 12 months home-confinement.

### A. Walker's Guidelines Calculations

To determine a defendant's sentence, the court first calculates the total-offense level under the United States Sentencing Guidelines. To do so, the court starts with the base level for the offense and then determines whether any enhancements or reductions apply. The court then calculates the Guidelines sentence given the particular defendant's criminal history.

The base-offense level for deprivation of civil rights, *see* 18 U.S.C. § 242, when the use of force is involved is 10. Walker received a six-point enhancement because the offense was committed "under color of law." *See* USSG § 2H1.1(b)(1)(B). He also received a two-point vulnerable-victim enhancement because C.C. was handcuffed and, as a prisoner locked in a cell, unable to flee. *See* USSG § 3A1.1(b)(1); *see also United States v. Tapia*, 59 F.3d 1137, 1143 (11th Cir. 1995)(holding that a victim was vulnerable by

virtue of his incarceration status and his inability to escape).

With these enhancements, Walker's offense level was 18. After subtracting three base points for acceptance of responsibility, his total-offense level was 15. Since Walker had no criminal history, he was in criminal-history category I, resulting in a Guideline sentence range of 18 to 24 months incarceration.

B. Judicial Discretion in Sentencing

Having reviewed the Guidelines calculation, the court next determined a reasonable sentence. Under the Supreme Court's current framework, the Sentencing Guidelines are not mandatory. *See United States v. Booker*, 543 U.S. 220, 245 (2005). Instead, the district court must independently determine a reasonable sentence by applying the sentencing factors listed in 18 U.S.C. § 3553(a):

> "(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

"(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

"(3) the kinds of sentences available;

"(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the [sentencing] guidelines ...

"(5) any pertinent policy statement [by the Sentencing Commission] ...

"(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

"(7) the need to provide restitution to any victims of the offense."

While calculations by the Guidelines are an attempt to approximate these diverse factors, a judge may, in the course of an individual sentencing, determine that "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply [or] the Guidelines sentence itself fails properly to reflect § 3553(a) considerations." *Rita v. United States*, 551 U.S. 338, 351 (2007).

C. Walker's Sentence

The unique circumstances of this case made balancing these diverse factors to fashion just punishment a challenge. On the one hand, the question before the court was how to punish an individual adequately for what was largely a failure on the part of the State of Alabama: Walker was ill-suited for corrections and was placed in an overcrowded, understaffed prison without any training and often without oversight. In other words, if the ADOC had adequately screened, trained, or supervised Walker,

13

this incident could have been avoided in its entirety. On the other hand, one of the purposes of sentencing is deterrence, or here, sending a message to corrections officers and trainees alike that the prisoners under their care are human beings and should be treated as such: assaulting a prisoner, under any circumstances, is a serious offense. This societal interest must clearly factored into the 'fair justice equation.'

The government, having taken into consideration Walker's lack of training but emphasizing the need to deter other officers from similar conduct, sought a downward variance to six months incarceration. Walker emphasized both his lack of training as well as the damage a term of incarceration would do to his education and his mental-health treatment, and moved for a downward variance to 12 months home-confinement.

Having calculated the Guidelines range, considered relevant policy statements, and having independently evaluated the resulting sentence in view of the § 3553(a) factors, the court rejected the

Guidelines sentence, as well as the sentences proposed by the government and Walker respectively. Instead, the court sentenced Walker to four consecutive weekends incarceration, six months home-confinement, and three years of supervised release, with counseling twice a month as a special condition of his supervision. The court chose this sentence for several reasons.

First, the court agreed with the government and Walker that a substantial downward variance from the 18 to 24 month Guidelines sentence was warranted, based on the nature and circumstances of this case, as well as the unique characteristics of then-cadet Walker. The court, of course, has seen many correctional and law enforcement officers who used force to deprive a civilian of their civil rights under the color of law; however, in those cases, the officers were precisely that: officers. Although the ADOC gave Walker's the title of "cadet", he had none of the qualifications that title implies. He did not receive and was not receiving any training, either on the job or at the

academy, and the supervision he received was minimal. Walker was essentially a civilian in a cadet costume. And yes, while it is common decency not to strike a defenseless person, the court cannot find that an untrained civilian, alone in an overcrowded, understaffed correctional facility, would know how to respond appropriately to a conflict with an inmate. *See* Calloway Affidavit (doc. no. 22-16) (stating that "[y]oung, immature Correctional Officer Trainees, without adequate training, are not mentally equipped to handle issues that arise with inmates," which is "why they are required to shadow senior Correctional Officers.") Indeed, the position Walker found himself in that precipitated the offense conduct--without supervision and giving orders to an inmate--is against the ADOC's written policy. *See* ADOC Admin. Reg. No. 219: Training (doc. no. 22-10).

Further, Walker had a history of mental-health issues: a fragile self-esteem, angry outbursts, and a documented suicide attempt. If the ADOC had done its

due diligence in screening Walker, it would have become apparent that he was likely a poor candidate for a career in corrections, and the department could have taken necessary precautions.

Not only did the State of Alabama's failure to train and provide the necessary support to Walker mitigate against a sentence of imprisonment, but so also did Walker's response to mental-health counseling and educational offerings. He, like everyone else, deserves an opportunity to become a productive member of society. He took a number of positive steps toward that end, and the court found that a sentence of incarceration would interrupt, if not completely arrest, that progress. A sentence of multiple months incarceration would remove Walker from college during his seventh of ten semesters. At the time of sentencing, Walker had also been seeing a counselor twice a month for the previous two months, and the positive changes in his demeanor and self-esteem were apparent to the court. A sentence of incarceration

would suspend his mental-health treatment, a result which not only would be to his detriment but which would make him a greater risk to the public. Finally, sending Walker to prison would effectively punish his mother, whom he cares for by cooking meals, making sure she takes her medication, and providing emotional support when he is not at work or school.

At the same time, the court agreed with the government that a sentence of home-confinement alone would not satisfy the societal need for the sentence imposed to reflect the seriousness of the offense or afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2)(A)-(B). While there were compelling mitigating circumstances, Walker did assault a prisoner; a prisoner he took an oath not to harm. *See* Oath of Office (doc. no. 51-1) ("I, Jeremy Walker, do solemnly swear that I will support the Constitution of the United States . . . and will, in no case ill treat or abuse any convict under my charge or control"). A sentence of home-confinement alone would

fail to acknowledge the fact that being in prison does not mean a person is forgotten--that his value as a human being is the same as any other human being. A prisoner being attacked, especially by someone presented as an officer of the state, is serious. A sentence of home-confinement alone would have failed to capture the severity of the offense conduct.

Considering the types of sentences available, the State of Alabama's failure to screen, train or supervise Walker as contributing to the offense, Walker's relative youth and lack of criminal history, and the need for him to receive mental-health treatment and an education, the court found a sentence of six months home-confinement appropriate. In light of the severity of the offense and in an effort to deter other people working in corrections from engaging in the offense conduct, the court found a sentence of four consecutive weekends incarceration appropriate.

* * *

For these reasons, the court found the sentence imposed of four consecutive weekends custody, sixth months home-confinement, and three years supervised release to be sufficient but not greater than necessary to comply with the purposes of § 3553(a).

DONE, this the 28th day of December, 2017.

/s/ Myron H. Thompson
**UNITED STATES DISTRICT JUDGE**